ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| DODS, Inc. | )     ASBCA Nos. 57746, 58252 |
| | ) |
| Under Contract No. W31P4Q-11-C-0133 | ) |

APPEARANCE FOR THE APPELLANT:     Mr. David Storey
President

APPEARANCES FOR THE GOVERNMENT:     Raymond M. Saunders, Esq.
Army Chief Trial Attorney
LTC Mark A. Ries, JA
Erica S. Beardsley, Esq.
Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE PEACOCK

These disputes under the captioned contract, for the supply of the center wing sections for the government's "workhorse" aerial target system, involve an appeal from a termination for default for failure to make progress (ASBCA No. 57746) and related affirmative contractor claims for alleged delay (ASBCA No. 58252). We deny both appeals.

FINDINGS OF FACT

The Solicitation and Pre-Contract Communications

1. The U.S. Army Contracting Command, Aviation and Missile Command (AMCOM) Contracting Center (the "government") issued Solicitation No. W31P4Q-10-T-0079 (the "solicitation") to procure one first article and eight production units of the center wing section for the MQM-107 aerial target system (ATS) on behalf of the Targets Management Office (TMO) (R4, tab 2). The ATS is the government's workhorse and most versatile aerial target, used for testing and evaluating weapons systems and training military personnel. It is about 18 feet long with a 10-foot wingspan, is self-propelled by a turbo jet engine, is capable of aerodynamic maneuvers sufficient to engage in air-to-air combat training with manned fighter jets, and is recoverable for reuse. (R4, tabs 69, 85, 86; tr. 2/192-94) The center wing section consists of a panel that is about 5 feet by 3.5 feet in size and is about 2 inches thick, along with the leading edges, which form the curved, aerodynamic shape of the wing front (tr. 2/195-96, 3/120).

2. The government distributed the solicitation and its accompanying technical data package (TDP) directly to potential contractors on 21 July 2010. The TDP was

provided only on a compact disc (CD) (hereinafter the "TDP CD"), and contained all technical data required to build the center wing section. (Tr. 1/29-30) The paper version was not provided to DODS or any other potential contractor (tr. 1/33).[1] The TDP CD contained files in pdf or C4 format (hereinafter "pdf") consisting of dozens of government part number drawings and also contained a "readme" file with instructions for accessing the information on the TDP CD and a helpdesk telephone number for troubleshooting assistance (tr. 3/199-200). Some of the drawings provided on the TDP CD are called digital data drawings, which provided instructions on how to use the three-dimensional computer aided design (CAD) models depicting the outer surface and shape of the center wing section (tr. 2/194, 202, 3/196, 199).

3. The CAD models provided on the TDP CD were developed from, and replaced, the original master lines, commonly referred to as Mylars. The TMO stopped using Mylars and began including CAD models in the TDP provided to prospective contractors in the 1990s because CAD models provide greater accuracy. (Tr. 2/198-99, 202) The CAD models were meant to be imported into computer numeric control (CNC) milling machines, and the CNC milling machines in turn would make molds, otherwise known as "tooling" or "special tooling" to make the physical parts for the end item (tr. 2/196, 199-200). The center wing section could not have been produced without using the CAD files provided by the government on the TDP CD (tr. 3/198-99). The CAD files were provided in at least six different specific CAD programs as well as other neutral, or generic, file formats. The neutral formats allowed for the CAD models to be used by many CAD programs other than the specific program versions provided on the TDP CD. The digital data drawings on the TDP CD provided instructions for using the CAD files. (Tr. 2/205-10)

4. Among the potential contractors sent the solicitation and TDP was a company called TTF, LLC (TTF) (tr. 1/31). Although the government sent the solicitation and accompanying TDP to TTF, Mr. David Storey acknowledged receipt of the solicitation and TDP on behalf of DODS on 27 August 2010 (R4, tab 4 at 28; tr. 1/30-31). Mr. Storey is the president or manager of TTF (R4, tabs 78, 80; app. supp. R4, tabs 40, 41; exs. G-2 at 1, G-5 at 1, G-12 at 1). Mr. Storey is the sole owner of both DODS and TTF (R4, tabs 78, 80; exs. G-2 at 1, G-5 at 1, G-6 at 3). TTF is located at 1400 Mills Highway, Breaux Bridge, Louisiana. DODS consists of a "lean-to" against the side of the TTF building with an address of 1402 Mills Highway, Breaux Bridge, Louisiana. DODS and TTF operate out of shared office space. (R4, tabs 78, 80)

5. DODS submitted its unqualified quote in response to the solicitation on 29 August 2010 (R4, tabs 4, 78, 80). The government received a total of three quotes in response to the solicitation, and awarded a contract to the bidder with the lowest priced quote. Within one week of award, the awardee notified the government that it could not

---

[1] Tab 3 in the Rule 4 file is a physical representation of the data contained on the TDP CD.

produce the center wing section and requested that its contract be cancelled. (R4, tab 5; tr. 1/32)

6. On 19 October 2010, while the cancellation of the initial award was processing, the contract specialist contacted the next lowest quote, DODS, by email to determine whether its quoted price was still valid and to seek assurance that DODS could produce the center wing section. The contract specialist informed DODS that the initial awardee was unable to perform the contract because it was incapable of producing the required wing section, and requested that DODS confirm its ability to produce or access the proper tooling to make "the main channels (i.e., -15, -16, etc.) or the leading edges (i.e., -3, -2, etc.) or the bonding for the main body." (R4, tab 5) The contract specialist questioned these specific capabilities because they directly related to the inability of the initial awardee (R4, tab 5; tr. 1/33-35). The channels are extruded parts on the right-hand and left-hand sides of the center wing section for interface with the outboard wing assemblies (R4, tab 3 at 104; tr. 2/212-13). Extruded parts, generally, are "long narrow item[s] of continuous cross-section…made by forcing a material through a die, such that the material takes on the shape of that die" (tr. 2/213). An everyday example of an extruded part is a train rail (*id.*). The channels for the center wing section have a specific cross-section, and are therefore not "off-the-shelf" items (tr. 3/208-09).

7. On 20 October 2010, DODS responded to the contract specialist's 19 October 2010 email stating that it was "pleased to accept [her] offer" and asking several questions regarding the requirement:

> In an effort to expedite the First Article delivery would you please request clarity for the following questions:
>
> 1. BR-127 is our preferred Adhesive Primer. Is there any objections [sic] as MIS-26333K does not identify a primer other than one compatible to the adhesive system.
>
> 2. Hysol's 9628, FM-132-2, or AF-126-2 for the film adhesive or equivalents.
>
> 3. ISO 9001-2000 until November then ISO 9001-2008 for our Quality System.
>
> 4. DOD's [sic] Autoclave is rated at 50 PSI and 350 F.
>
> MIS-26333K on page 3, Section 3.1.1 requires an Autoclave [sic] capable of pressures 10 to 100 PSI at 350 F.

3

However, the Center Wing Structure Cure Cycle is
at 260-280 F, 9 F max heat up rate per minute, 10 to 80 PSI,
for 55-140 minutes.

Well within our capabilities. Is this acceptable?

5. A sample part. Can be from a crashed unserviceable unit
for clarity to engineering drawings.

(R4, tab 6)

8. Also on 20 October 2010, DODS responded to the contract specialist's email and affirmed its capability to produce the part (R4, tabs 7, 78, 80). DODS specifically assured the contract specialist that, "[w]e have the capability or access to or can acquire through a vendor the proper tooling to make all the main channels (i.e., -15, -16, etc.) or the leading edges (i.e., -3, -2, etc.) or the bonding for the main body." DODS also states that, "in addition DODS, Inc has a HAAS VF 9 with a bed 36 by 96 inches, [t]hree Hydraulic Presses with the largest bed 120 by 36 inches rated at 800 tons, one heat treat oven, and two Autoclaves." (R4, tab 7) However, although not yet known by the contracting officer (CO) TTF, not DODS, owned the hydraulic presses, heat treat oven, and autoclaves (R4, tab 54 at 22-25; tr. 1/96, 5/71-78).

9. On 3 November 2010, the contract specialist provided DODS with responses to its questions from 20 October 2010. Of particular relevance to these appeals, DODS was informed on 3 November 2010 that the government agreed to DODS' use of the BR-127 adhesive primer and that the Hysol 9628, FM-132-2, and AF-126-2 film adhesives were all suggested by the specification and DODS could choose one to use. (R4, tab 3 at 171, tabs 8, 78, 80; tr. 4/11-15) DODS did not seek any additional clarification regarding any of the issues raised in its 20 October 2010 email prior to contract award (tr. 1/37).

10. On 3 November 2010, DODS thanked the contract specialist for the information and informed her that DODS was ready to proceed with the contract (R4, tabs 10, 78, 80). On 29 November 2010, DODS sent an email to the contract specialist stating, "[c]an you please provide status as I have a few people already working on this (at my own risk)" (R4, tab 13). DODS requested updates on the status of the contract award several more times between 29 November 2010 and 3 January 2011 (R4, tabs 15, 17, 19, 21).

11. On 4 January 2011, the contract specialist requested that DODS inform the government of the date by which DODS would deliver the inspected first article so that the contract would reflect accurate dates (R4, tab 22). DODS responded the same day that the first article would be complete, including the first article inspection, within 206 "DARO," or days after receipt of order (R4, tab 23; tr. 1/39). From 4 January 2011, 206 days would have been 29 July 2011, but DODS' email indicated the date of 2 August

4

2011 (R4, tab 23). The contract as eventually awarded actually provided DODS more time than it requested by setting the first article delivery date as 31 August 2011, or 217 days after contract award (R4, tab 1 at 3).

12. On 21 January 2011, the contract specialist requested that DODS "please review the attached contract for errors or changes needed on your end" (R4, tab 26). The "attached contract" referred to by the contract specialist and provided to DODS prior to contract award was identical to the document contained in the Rule 4 file at tab 1, with the exception of signatures and one error noted by DODS and corrected prior to award (tr. 1/42-43). On 24 January 2011, DODS responded indicating that DODS had reviewed the contract and that the "Contract looks good. I only found one correction and that would be the production delivery date of December 31, 2011 (CLIN 0001AB). That is the date the First Article review would be due. The Production is to follow at 113 days or April 25, 2012." (R4, tabs 27, 78, 80; tr. 1/40-43) The production delivery date was adjusted to 30 April 2012 before the contract was signed, again providing DODS more time that it requested (R4, tab 1 at 4; tr. 1/42-44).

13. On 26 January 2011, the government awarded Contract No. W31P4Q-11-C-0133 (the "contract") to DODS (R4, tabs 1, 78, 80). The final signed copy was provided to DODS on 27 January 2011 (R4, tab 28). The contract was awarded as a firm fixed-price contract with one contract line item number (CLIN) 0001, for Part Number 13458239, NSN 1560-01-386-8205, the center wing section of an ATS. The CLIN was subdivided into two subCLINs 0001AA and 0001AB. SubCLIN 0001AA was for the first article production and delivery by 31 August 2011 at a price of $84,900. SubCLIN 0001AB was for the remaining eight production units at a unit price of $51,900 each, for a total amount for subCLIN 0001AB of $415,200. The total contract price for the first article and the production units was $500,100. (R4, tab 1 at 1, 3-4) The contract incorporated by reference FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) clause. The contract also included FAR 52.209-4, FIRST ARTICLE APPROVAL – GOVERNMENT TESTING (SEP 1989), ALTERNATE I (JAN 1997) clause. (R4, tab 1 at 17)

14. The contract provided for government inspection at origin and acceptance at destination for both subCLINs. The destination for the first article was designated as Redstone Arsenal, Alabama, and the destination for the production quantity was designated as Fort Bliss, Texas. (R4, tab 1 at 3-4; tr. 1/44) Contract administration was delegated to the Defense Contract Management Agency (DCMA) Dallas (R4, tab 1 at 1; tr. 2/8, 4/44).

15. The contract incorporated by reference FAR 52.246-2, INSPECTION OF SUPPLIES–FIXED-PRICE (AUG 1996) clause. This clause stated, in relevant part:

> (b) The Contractor shall provide and maintain an
> inspection system acceptable to the Government.... As part
> of the system, the Contractor shall prepare records evidencing

5

all inspections made under the system and the outcome. These records shall be kept complete and made available to the Government during contract performance and for as long afterwards as the contract requires. The Government may perform reviews and evaluations as reasonably necessary to ascertain compliance with this paragraph. These reviews and evaluations shall be conducted in a manner that will not unduly delay the contract work. <u>The right of review, whether exercised or not, does not relieve the contractor of the obligations under the contract.</u> [Emphasis added]

(c) The Government has the right to inspect and test all supplies called for by the contract, to the extent practicable, at all places and times, including the period of manufacture, and in any event before acceptance. The Government shall perform inspections and tests in a manner that will not unduly delay the work. The Government assumes no contractual obligation to perform any inspection and test for the benefit of the Contractor unless specifically set forth elsewhere in this contract.

(d) If the Government performs inspection or test on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties....

....

(i)(1) If this contract provides for the performance of Government quality assurance at source, and if requested by the Government, the Contractor shall furnish advance notification of the time (i) when Contractor inspection or tests will be performed in accordance with the terms and conditions of the contract and (ii) when the supplies will be ready for Government inspection.

(2) The Government's request shall specify the period and method of the advance notification and the Government representative to whom it shall be furnished. Requests shall not require more than 2 workdays of advance notification if the Government representative is in residence in the

6

Contractor's plant, nor more than 7 workdays in other instances.

(R4, tab 1 at 6)

16. The contract incorporated by reference FAR 52.246-11, HIGHER-LEVEL CONTRACT QUALITY REQUIREMENT (GOVERNMENT SPECIFICATION) (FEB 1999) clause. The contract filled-in the clause by specifying that, "THE CONTRACTOR SHALL COMPLY WITH THE HIGHER LEVEL CONTRACT QUALITY REQUIREMENT ANSI/AQSC Q9002 OR EQUIVALENT." (R4, tab 1 at 6)  The higher level quality clause was included because of the critical nature of aircraft parts.  Compliance with the higher level quality clause required a more structured manufacturing environment. (Tr. 1/45, 4/49-50)  The higher level quality system requires the contractor to have a quality manual and other implementing documents that comply with the quality requirement, and requires that the contractor comply with its quality documents (tr. 4/142-43).

17. The contract incorporated by reference FAR 52.242-17, GOVERNMENT DELAY OF WORK (APR 1984) clause.  This clause stated, in relevant part:

> (a)  If the performance of all or any part of the work of this contract is delayed or interrupted.... (2) by a failure of the Contracting Officer to act within the time specified in this contract, or within a reasonable time if not specified, an adjustment (excluding profit) shall be made for any increase in the cost of performance of this contract caused by the delay or interruption and the contract shall be modified in writing accordingly.  Adjustment shall also be made in the delivery or performance dates and any other contractual term or condition affected by the delay or interruption.  However, no adjustment shall be made under this clause for any delay or interruption to the extent that performance would have been delayed or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an adjustment is provided or excluded under any other term or condition of this contract.

> (b) A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the contractor shall have notified the Contracting Officer in writing of the act or failure to act involved; and (2) unless the claim, in an amount stated, is asserted in writing as soon as

7

practicable after the termination of the delay or interruption, but not later than the day of final payment under the contract.

(R4, tab 1 at 7)

18. The contract required that DODS comply with Aerospace Material Specification (AMS) 2770, a process specification for the heat treatment of wrought aluminum alloy parts (R4, tab 3 at 16-25, tab 70 at 1; tr. 5/32-34). Although some parts lists notes within the TDP contained references to the military heat treatment specification MIL-H-6088, the technical data parts list (TDPL), incorporated into the TDP, dictated which specifications actually applied to the contract (R4, tab 3 at 107; tr. 5/31). The TDPL lists the drawings and specifications included in the TDP (tr. 5/31).

19. AMS 2770H, paragraph 3.1.2.1, "Heating Media," provided in pertinent part that, "[t]he products of combustion and other materials that could contaminate parts shall not come into contact with parts" (R4, tab 70 at 2).

20. AMS 2770H, paragraph 4.1, "Responsibility for Inspection," provided that:

[T]he processor shall be responsible for the performance of all tests and inspections specified herein. The procuring activity reserves the right to perform any surveillance or tests or inspections of parts, and to review heat treating records and results of processor's tests and inspections to verify that heat treating conformed to the specified requirements.

(R4, tab 70 at 8)

21. The contract directed compliance with MIS-26333, a military process specification for adhesive bonding requirements for the ATS (R4, tab 3 at 16; tr. 3/8, 4/13). MIS-26333, paragraph 3.3.4.5, "Controlled area," referenced to by the parties as "clean room" required that "[t]he application on primer and adhesive films shall take place in a clean, protected, dust-free area. The temperature shall be 75 [degrees, plus or minus 10 degrees] and the relative humidity shall not exceed 80 percent." (R4, tab 3 at 155)

22. MIS-26333K, paragraph 6.2.2, "Approved sources," provided that "[o]nly the following listed products are approved for use on the MQM-107 target system." Paragraph 6.2.2.1, "Adhesive System A," provided in relevant part: American Cyanamid Co., Part Number "FM-123-2, or equal"; Hysol Division, The Dexter Corp., Part Number "EA9601, or equal[;] EA9602, or equal"; and Minnesota Mining & Mfg. Co., Part Number "AF-126-2, or equal." (R4, tab 3 at 171) The inclusion of "or equal" after listing the specific manufacturer and product allowed the contractor to use any of

8

the listed products or the updated versions then available from the manufacturer (tr. 2/14, 162, 3/105-06, 161, 4/14-15, 5/8-9, 23).

23. Shortly after award of the contract, the contract specialist queried DODS regarding its capability to produce the center wing section (R4, tab 30; tr. 1/49). On 8 February 2011, DODS sent an email to the contract specialist in response to questions about DODS' capability to perform the contract work and produce the center wing section as required by the contract. In the email, DODS affirmed that "DODS has the capability to manufacture this item in-house. DODS is in the process of quoting details and materials, designing the tooling.... Will probably outsource Skin Cleaning and Adhesive Primer application." (R4, tabs 30, 78, 80)

24. Unknown at that time to the contract specialist or the CO, or anyone else at the buying command, DODS actually consisted only of a "lean-to" against the side of the building owned by TTF (R4, tabs 78, 80; tr. 1/96, 5/57-58). DODS had insufficient manufacturing space, facilities, or equipment of its own to manufacture the center wing section (R4, tab 54 at 22-25; tr. 5/71-78).

25. On 7 April 2011, a DCMA Quality Assurance Representative (QAR), held a "QA Only Post-Award Conference" with DODS (R4, tab 32; tr. 5/138). A QA only post-award conference is one of the DCMA's surveillance mechanisms to ensure the quality of a product, and is held only pursuant to and consistent with internal DCMA policy.

26. Among the matters discussed at the post-award conference and recorded on the Post-Award Conference Record were the following: Mr. Storey stated that DODS was preparing requests for quotes (RFQs) and the QAR reminded DODS to provide copies of all released purchase orders (POs) to the QAR for review and delegation determination; Mr. Storey twice stated, without qualification, that DODS would meet the 31 August 2011 First Article delivery date; the QAR noted that as of the date of the conference, there was no production and no production employees in DODS plant; Mr. Storey stated that no "special tooling" would be necessary to manufacture the subject item; the QAR reminded DODS that its heat treating process and equipment must be validated and certified before being placed in the production flow; the QAR discussed the contract's higher level quality requirement, and DODS stated it understood; DODS expressed the need for clarification concerning a drawing, and the QAR advised DODS to contact engineering support for the buying command for clarification (R4, tabs 32, 78, 80; app. supp. R4, tab 7; tr. 5/139-58).

27. DODS was required to forward POs to the QAR so that the QAR could verify that the contract requirements were actually included in the PO and to determine whether the item or service that DODS was purchasing required a DCMA QAR to visit and inspect that vendor (R4, tab 1 at 6, tab 32 at 1; tr. 4/103-06). The contract required

9

DODS to flow down the quality and inspection requirements to any vendor or subcontractor.

28. At no time prior to 7 April 2011 did DODS inform the government or DCMA that DODS' work on the contract was delayed while waiting for the post-award conference (R4, tabs 78, 80; tr. 1/85-86, 2/138-40, 5/155-58). On 7 April 2011, during the post-award conference, DODS twice specifically stated, without qualification, that it would meet the first article delivery date of 31 August 2011 and made no reference regarding any alleged government delay (R4, tabs 32, 78, 80; app. supp. R4, tab 7; tr. 5/155-58). In fact, the first time that DODS raised the timing of the post-award conference as an alleged government delay was in a letter to the government on 6 July 2011 (R4, tabs 42, 78, 80; tr. 1/85-86, 2/138-40, 5/155-58). The timing of the post-award conference did not delay DODS performance (tr. 5/155-58). No contract clause or other direction from the CO required that a post-award conference be held.

29. Following receipt of a contractor's production plan, the DCMA QAR establishes "GMIPs" or government mandatory inspection points, by noting those points or processes during production for which the QAR requires advance notice and the opportunity to witness. These GMIPs do not hold up production. The DCMA QAR cannot notify the contractor regarding those inspection points without knowing the contractor's production plan. Once the DCMA QAR receives the production plan, the DCMA QAR can notify the contractor of the inspection points, or GMIPs, and then the contractor must notify the DCMA QAR at least seven days in advance of performing one of the GMIP processes. The notification allows but does not require, the DCMA QAR to be present to witness the process, but does not hold up the contractor's production. There is no evidence that DODS provided DCMA with any production plan prior to its 20 July 2011 response to the cure notice, as discussed below. (Tr. 4/94-97, 5/108-09)

DODS' Request for Assistance – Hidden Line

30. On 16 May 2011, DODS emailed a letter to the former contract specialist and raised for the first time with the CO its request for assistance regarding the drawing that the QAR told DODS to take to the engineering support for the buying command for clarification at the post-award conference on 7 April 2011 (R4, tab 32 at 4, tab 37; tr. 5/152-53). The complete text of the question in the letter was: "Regarding Contract W31P4Q-11-C-0133, we at DODS request engineering assistance. On the left and right hand end of the attach bracket is a hidden line (long rectangle) that is unidentifiable. Is this part of the next higher assembly? Please advise." (R4, tab 37) There were no drawings, explanations or other attachments to the letter (id.; app. supp. R4, tab 1; tr. 4/15). The letter did not indicate that the request for assistance was urgent or delaying production (R4, tab 37; app. supp. R4, tab 1; tr. 1/86, 88-89).

31. The TMO engineer responsible for responding to the CO regarding technical questions for the MQM-107 was away on temporary duty (TDY) until 23 May 2011.

Upon his return, he researched the question and developed a response. (Tr. 1/65-66) To determine the answer, the engineer went to the TDP and located the top part drawing, and worked his way through the drawings to deduce the basis of DODS' question (R4, tab 3 at 112; tr. 4/16). On the top part drawing, the engineer located several "hidden lines," which are depicted as dashed lines on drawings and represent something underneath the current drawing's perspective. The drawing contains directions to find another drawing from a different view point, a cut-away view, to determine what the hidden line represents (tr. 2/214-15, 4/16, 18).

32. The TMO engineer then proceeded through several steps to read the drawings and determine that he thought the answer to DODS' question was that the hidden line represented a nut assembly, a part included in the parts list for the center wing section (tr. 4/16-26). The process to determine this answer took the TMO engineer, who had worked at the TMO for less than a year and had never reviewed the MQM-107 drawings prior to determining the answer to DODS' hidden line question, about one hour (tr. 3/232, 4/32-33, 5/12-13). Although the specific hidden lines examined by the engineer could only have represented the nut assembly (tr. 3/135-37, 211, 4/25-32), as a result of the vagueness of DODS' question, the engineer still was not certain that DODS' question pertained to these particular hidden lines until the hearing in these appeals (tr. 4/34).

33. Once the engineer had determined his answer to DODS' hidden line question, the response had to be approved by a senior government TMO representative, but that person was on TDY until the following week (tr. 1/65-66).

34. On 21 June 2011, DODS submitted a request for assistance, reiterating its "hidden line" query and asking seven additional questions. Although DODS' letter is dated 16 June 2011, DODS did not email the letter until 21 June 2011 (hereinafter, "DODS' 21 June 2011 letter"). (R4, tab 38; tr. 1/75) The text of DODS' request was as follows:

> This is a follow-up to our previous request for engineering assistance sent May 16, 2011. DODS requests engineering assistance for the following:
>
> 1. On the left and right hand end of the attach bracket is a hidden line (long rectangle) that is unidentifiable. Is this part of the next higher assembly? Please advise.
>
> 2. Request to use Hysol EA9628.06 ILO EA9601 or EA9602 as the equal alternative.
>
> 3. Request to use BR-127 Adhesive Primer.

11

4. Request to use MA-562 BMS 5-90 Core Splice Foaming Adhesive ILO FM-37 as the equal alternative.

5. Request to use EA960F ILO EA960 as the equal alternative.

6. Request to use BAC 5555 Phosphoric Acid Anodize ILO ASTM-3933 as the equal alternative.

7. Part Number PL13458219-4 is not listed in the Parts List but is shown on the corresponding drawing, Sheet 4, D7. Please advise material and thickness.

8. Request to use AMS 2770 ILO MIL-H-6088.

Please advise.

(R4, tab 38) DODS' 21 June 2011 letter included two attached pages with what appears to be copied drawings. The first document had handwriting circling portions of the drawing and referencing "Question #7." The second document matches the drawing description in DODS' 21 June 2011 letter request number 7. (R4, tab 3 at 105, tab 38) Nothing in DODS' 21 June 2011 letter informed the CO that DODS' issues were impacting production or indicated urgency in any way (R4, tab 38).

35. The CO answered DODS' "hidden line" request in a letter dated and emailed 22 June 2011, stating:

> We assume the long hidden line rectangle mentioned by the vendor is the one by the Find No. 1 callout in section D1 of drawing 13458239. If you follow Find No. 1 to drawing 13458219 sheet 3 Section N-N, you will see Find No. 37 (-19 channel, 11557862) and Find No. 19 (-20 nut assembly, NAS689P16-8. The hidden lines indicate the nut assembly.

(R4, tab 39) The "We assume" language was included because DODS failed to adequately explain or describe its question to ensure that the TMO engineers would review the specific uncertainty (R4, tab 39; tr. 1/66, 4/35). The CO's email with her 22 June 2011 letter attached was incorrectly addressed, omitting the "c" in "com." The CO however, did not realize the error because she received an automated delivery confirmation notice. (R4, tabs 39, 40; tr. 1/66-68, 73-74)

36. On 6 July 2011, DODS sent an email to the government and requested a 120-day extension citing materials unavailability, government delay in responding to requests to use alternate products, and the time between contract award and the post-award conference with DCMA (R4, tab 42). DODS' 6 July 2011 letter was the first instance in which DODS informed the government of any alleged government delay for any cause, including the hidden line issue (R4, tabs 42, 78, 80; tr. 1/85-86, 2/138-40, 5/155-58).

37. On 8 July 2011, the CO notified DODS in a letter attached to an email that the CO had answered DODS' hidden line question in her 22 June 2011 letter (R4, tab 44; tr. 1/69-70). This email message was missing the "c" in "com" for Ms. Beniest's (Mr. Storey's personal assistant) email address, but it was correctly addressed to Mr. Storey's email address.

38. On 11 July 2011, DODS sent an email acknowledging receipt of the CO's 8 July 2011 letter, and requested that the CO send DODS a copy of the letter dated 22 June 2011 (R4, tab 46; tr. 1/93). On the same day, 11 July 2011, the CO emailed to DODS another copy of her 22 June 2011 response to DODS regarding its "hidden line" request (R4, tab 47; tr. 1/73-74). Appellant presented no evidence detailing to what extent, if any, the timing of the government's response to its question impacted DODS' performance under the contract.

39. Resolution of DODS' "hidden line" request was not required to proceed with assembly. DODS should have been able to determine what the hidden line represented on its own (tr. 4/12-13). The answer was readily apparent from reading the drawings (tr. 3/223, 4/32-33). DODS could also have easily worked backwards from the parts list to cross-check what the hidden line represented (tr. 4/29). DODS could also have ordered the parts required for assembly and determined through assembly that the only possibility was that the hidden line represented the nut assembly (tr. 5/12-15). There is no evidence establishing how the hidden line request prevented DODS from ordering the parts and beginning assembly. DODS could have assembled the center wing section without knowing what the hidden line represented and still have been able to add the nut assembly because it sits in a channel easily accessible after assembly. (Tr. 5/15)

40. Requests 2 and 3 in DODS' 21 June 2011 letter repeated questions that DODS posed in its email of 20 October 2010 and that the government answered on 3 November 2010 (R4, tabs, 6, 8, 38). Both DODS' requests were unnecessary (tr. 5/8-9). With respect to request 2, the TDP in MIS-26333K listed several alternative products and provided the contractor with the authority to use an "equal" (R4, tab 3 at 171; tr. 2/14, 162, 3/105-06, 161, 4/14-15, 5/8-9, 23). DODS could have chosen one of the other products listed in MIS-26333K or it could have simply used the Hysol EA9628.06 as an equal alternative to the Hysol EA9601 or 9602 (tr. 2/14, 162, 3/105-06, 161, 4/14-15, 5/8-9, 23). Even if DODS wanted government approval, it did not need to hold up its production while

13

waiting for the response to either request 2 or 3. DODS could have ordered materials, cut materials, developed the tooling needed to create the leading edges, among other production steps, while it waited for the government approval. (Tr. 5/12, 17-18, 34-35)

41. Requests 4 and 5 in DODS' 21 June 2011 letter presented a new request regarding use of specific adhesives but again lacked any explanation or indication of production impact or urgency. With respect to request 4, the TDP did not require the use of one specific adhesive; rather, the contractor was provided with suggested sources of supply, including three vendors and five different adhesives. DODS could have used any of those listed, or could have used other adhesives because the ones listed in this instance were merely suggested. (R4, tab 3 at 73; tr. 5/20-22, 34-35) With respect to request 5, the TDP in MIS-26333K listed a product and provided the contractor the authority to use an "equal" (R4, tab 3 at 172; tr. 2/14, 162, 3/105-06, 161, 4/14-15, 5/8-9, 23). According to the TMO engineer, the adhesive DODS requested to use was very clearly the same adhesive as the listed product except that the manufacturer had denoted F to indicate that it was a faster curing adhesive (tr. 5/23). Even if DODS wanted government approval, it did not need to hold up its process waiting for the government's response to either request 4 or 5. DODS could have ordered materials, cut materials, developed the tooling needed to create the leading edges, among other production steps, while waiting for the government's response. (R4, tab 3 at 73; tr. 5/20-24, 34-35)

42. Request number 6 in DODS' 21 June 2011 letter presented a new request but again lacked any explanation or indication of production impact or urgency (R4, tab 38; tr. 2/162-63, 3/164, 5/14, 39). This request dealt with phosphoric acid anodizing specifications, and DODS requested to use the Boeing specification BAC-5555 instead of the industry standard specification included in the TDP, ASTM-3933. In this instance, the TDP did not provide the contractor with the choice of an "or equal" replacement. The government denied DODS' request unless DODS provided a detailed explanation as to why the Boeing specification was equal or better than the TDP specification because the government did not have access to the Boeing specification. Even if DODS had some legitimate reason for desiring to adhere to the BAC-5555 specification rather than the ASTM-3933 specification, it did not need to hold up its process waiting for the government's response. DODS could have ordered materials, cut materials, developed the tooling needed to create the leading edges, among other production steps, while waiting for the government's response. (R4, tab 3 at 148, tab 50; tr. 1/90, 5/24-27, 34-35)

43. Request 7 in DODS' 21 June 2011 letter requested clarification of a drawing, and provided some explanation and two attached drawing sheets (R4, tab 38). DODS stated that: "Part Number PL13458219-4 is not listed in the Parts List but is shown on the corresponding drawing, Sheet 4, D7. Please advise material and thickness." (R4, tab 38; tr. 5/27) The answer to Request 7 was readily determinable from the drawings (tr. 5/27-30). Part numbers are called "dash" numbers and are contained in the parts list portion of the drawings (tr. 5/27, 30). The Sheet 4, D7, however, does not indicate a part or a "dash 4" but points the reader to a Find Number 4, indicated on the drawing as

"(FN 4)" (R4, tab 3 at 105; tr. 5/27-30). Following the Find Number 4 to the parts list leads to the Dash Number 7 part, a doubler, and the parts list provides the material and thickness (R4, tab 3 at 109; tr. 5/30-31). DODS did not need to hold up its process waiting for the government's response. DODS could have ordered materials, cut materials, developed the tooling needed to create the leading edges, among other production steps, while waiting for assistance in reading the drawings. (Tr. 5/31, 34-35)

44. Request 8 in DODS' 21 June 2011 letter presented a new request but again lacked any explanation or indication of production impact or urgency (R4, tab 38). This request dealt with the heat treating specification, and DODS' request to use the AMS 2770 instead of the Military Specification H-6088 (MIL-H-6088) (R4, tab 38; tr. 5/31-32). This request was unnecessary because the TDP already required the use of the AMS 2770 specification (tr. 5/32). The TDPL includes a list of every drawing and specification included in the TDP (tr. 5/31). Several drawing notes in the TDP reference the MIL-H-6088 specification. The TDPL shows that MIL-H-6088 was replaced by AMS-H-6088, and shows that AMS-H-6088 was replaced by AMS 2770, 2771, and 2772. (R4, tab 3 at 22, 25, 27; tr. 5/31-33) In other words, the TDP already indicated that DODS should use AMS 2770 instead of MIL-H-6088. Even if DODS wanted government verification, it did not need to hold up its process waiting for the government's response. DODS could have ordered materials, cut materials, developed the tooling needed to create the leading edges, among other production steps, while waiting for the government's verification (tr. 5/34-35).

45. In its 6 July 2011 letter, DODS' first mention of an alleged government delay, DODS stated that the extension request was "due to unavailability of materials as stated in letters dated May 16, 2011 and June 20, 2011 [sic] requests for alternate products have gone unanswered for 2 months, causing a delay" (R4, tab 42). However, neither DODS' 16 May 2011 letter, nor its 21 June 2011 letter, indicated that its requests were based on unavailability of materials (R4, tabs 37, 38; tr. 1/85-86, 88-89). In fact, DODS' 16 May 2011 letter included only DODS' "hidden line" issue (R4, tab 37; tr. 1/88-89). Apart from not having raised the material availability issue until its 6 July 2011 letter, DODS provided no support for its assertion that materials were unavailable. The materials and specifications questioned in DODS' 21 June 2011 letter were actually still available. (R4, tabs 81-84; tr. 3/99-102)

46. On 8 July 2011, the CO denied DODS' 6 July 2011 request for an extension in the contract delivery date. In her letter, the CO informed DODS that she did not understand DODS' reference to DCMA delay. She also corrected DODS' assertions in its 6 July 2011 letter in which DODS stated that it had raised material unavailability in its 16 May 2011 letter. The CO informed DODS that she had answered its first question ("hidden line") in a letter dated 22 June 2011, its second and third questions in an email dated 3 November 2010, and that the answers to DODS' questions 4-8 (received on 21 June 2011) were awaiting engineering responses. The CO also requested that DODS provide the reasons and justifications for each of its questions or requests. (R4, tab 44;

15

tr. 1/87-90) DODS never provided the requested reasons and justifications (tr. 1/90). The CO's 8 July 2011 letter was received by DODS on 8 July 2011 (R4, tabs 44-46; tr. 1/92).

47. On 13 July 2011, the CO sent an email to DODS with her letter responding to the remaining five requests for assistance from DODS' 21 June 2011 letter. The CO's letter reminded DODS that questions 1 through 3 had been previously answered via email on 3 November 2010 and by letter dated 22 June 2011; approved DODS' request numbers 4, 5, and 8; denied DODS' request number 6 unless DODS provided a detailed explanation as to why its request was equal or better; and provided an explanation for DODS' request number 7. (R4, tab 50)

The Cure Notice and Response

48. The government received other information regarding DODS and the potential for performance problems beginning in late April 2011 (R4, tabs 33-36, 43, 58, 73, 74; tr. 1/52, 2/45-46). At that time, the CO received two Delay Notice – Review documents (the "Delay Notices") regarding the contract, dated 13 and 20 April 2011 respectively, and issued by the DCMA Industrial Specialist (IS). The IS is responsible for monitoring contractor performance and evaluating whether the contractor will meet the delivery date required under the contract. If the IS considers that the contractor may miss the delivery date, DCMA policy directs the IS to input a Delay Notice that alerts the buying command to the potential delivery delay. Delay Notices do not impact the contractor's production; do not cause production delays; do not stop production; and do not require any action on the part of the buying command. Rather, Delay Notices provide information from the IS, who is located in the general vicinity of the contractor, to the buying command, which is generally located a significant distance away. (R4, tabs 33, 34; tr. 2/43-50, 166-67, 4/72-75, 5/208, 211-12, 215-16) Prior to issuing the first Delay Notice on 13 April the IS contacted DODS, and DODS stated that it would meet the August 2011 first article delivery date (R4, tab 33; tr. 5/215). The Delay Notices did not directly lead to any overt action by the CO (tr. 2/49-50, 166-67). There is no evidence in the record that DODS was aware of the Delay Notices prior to receipt of the Rule 4 file in these appeals.

49. On 8 June 2011, in response to her request, the CO received additional documents and information from DCMA regarding DODS and TTF (R4, tab 58 at 3; tr. 1/195-96). Among the information that the CO received were 18 additional Delay Notices on other DODS' contracts (R4, tab 73), a report showing nine unacceptable pre-award surveys covering both DODS and TTF (R4, tab 74), and a level III Corrective Action Request response rejection letter indicating that TTF had serious quality problems and that its system was unacceptable to the government (R4, tab 31). Like the Delay Notices above, the CO was cognizant of the information received, considered the information as a "heads up" that DODS may have delay issues, and that she needed to look more closely at the situation (tr. 1/94-105). As of early June 2011, however, the CO had not yet been informed that DODS intended to subcontract work to TTF; and therefore, she did not give any weight to the TTF information (tr. 1/96-97).

16

50. On 27 June 2011, the CO met with the TMO engineers to discuss the contract, as well as other TMO managed items. The TMO engineers explained to the CO the importance of the center wing section and the critical processes that were required for its manufacture. The TMO engineers explained that the center wing section manufacturing required about 12 weeks to complete after receipt of materials. (R4, tabs 41, 58; tr. 1/80-85)

51. On 8 July 2011, the CO received an email from the DCMA IS regarding his visit to DODS on 7 July 2011. The email informed the CO that DODS had received some quotes for materials from vendors but had not yet ordered any material for the contract, and that DODS represented that it would take three weeks to produce the first article once all materials were received. The email also informed the CO that, relevant to another contract, Mr. Storey failed to properly conduct a heat treating test, introduced materials that could contaminate parts in the heat treating process, and the clean room was not ready for production. (R4, tabs 43, 58 at 4)

52. On 13 July 2011, the CO issued a Cure Notice to DODS. The cure notice explained that the government considered DODS had failed to make satisfactory progress endangering contract performance and that appellant's failure to cure its deficiencies within 10 days of receipt of the notice would provide the government the right to terminate the contract for default. The cure notice requested that DODS provide adequate assurances to the government that DODS could deliver the first article and other contract requirements on time. The CO outlined seven specific failures, including: (1) failure to meet performance standards in the contract and reiterated the 7 April 2011 post-award conference; (2) failure to provide a Clean Room; (3) failure to acknowledge the tooling requirement; (4) failure to obtain materials, parts, and supplies; (5) failure to put in place procedures, mechanisms, and requirements to implement the required ANSI/AQSC Q9002 quality assurance standards; (6) failure to validate and certify the heat treating process and artificial aging process; and (7) failure to obtain necessary materials. The CO also provided a general description of required actions by DODS to assure the government that DODS would meet the contract requirements, and she listed five specific documents to be provided: (1) certification of a fully implemented Quality Control Plan compliant with the higher quality level required by the contract; (2) a detailed Manufacturing Plan; (3) a comprehensive Production Plan listing all tooling and equipment; (4) documentation to support receipt of materials; and (5) a specific timeline to meet the 31 August 2011 delivery of the First Article. (R4, tab 52; tr. 1/106-08)

53. On 20 July 2011, DODS responded to the cure notice, substantially as follows:

> 1. DODS, INC's Quality System is acceptable to the Government. DODS, INC will be outsourcing portions of production to TTF, LLC with flow down requirements. Please see DODS's QCP attached (Exhibit A).
>
> 2. Attached please find the Manufacturing Plan (Exhibit B).
>
> 3. Attached please find the Production Plan, with equipment list (Exhibit C).
>
> 4. Requests for quotes have been sent out, and purchase orders were prepared pending confirmation for the use of alternate products. On July 13, 2011, a letter was received answering questions DODS, INC had on alternate material use and engineering clarity. Waiting for a response has delayed the purchasing of materials. Purchase Orders were faxed to vendors on July 15, 2011 (Exhibit D).
>
> As mentioned in a letter dated, July 06, 2011, DODS requested an extension for an additional two months as requests for engineering assistant [sic] were being researched. Now that responses have been received, DODS has been able to release the purchase orders. Some products purchase [sic] have a lead time of 10 weeks. This would not have created a problem if the requests were answered timely. [I]n addition, the Post Award was held April 06, 2011, 2 months after being awarded this contract, and as this has a First Article, DCMA has advised that participation is 100%, that all work performed without affording him the opportunity to plan and insert GMIP's during Post Awards would be rejected and a Corrective Action Report issued (Exhibit E). Waiting on DCMA is [sic] perform the Post Award and advise of GMIPs has delayed production by 2 months.
>
> DODS's objective is to deliver this product per the Production Plan, and we believes [sic] we are in good shape to successfully complete and deliver the First Article with a shipment date of October 24, 2011.
>
> DODS requests a modification extending the First Article delivery date to October 24, 2011, allowing 120 days

18

for FAA [first article approval], with a new delivery date of June 29, 2012 for the production articles.

(R4, tab 54)

54. DODS' cure notice response letter alerted the CO, for the first time, that DODS would "out source portions [of production] to TTF, LLC with flow down requirements" (R4, tab 54 at 2; tr. 1/109). DODS' Manufacturing Plan, provided in response to the CO's direction in the cure notice and included in the cure notice response as exhibit B, stated that parts are "sent to TTF, LLC to be bonded. The skins are brought into the clean room...where adhesive is applied...and parts are placed together." (R4, tab 54 at 18) Coupled with DODS' cure notice response letter, it became clear to the CO that DODS planned to subcontract bonding to TTF (tr. 1/109). The CO already knew that TTF had been found to have inadequate documentation of internal procedures for the bonding process because she received notice of such prior to issuing the cure notice (R4, tab 31; tr. 1/109-11, 123). The CO also received notice from DCMA during its cure notice response review that TTF's bonding methods and facilities were incapable of complying with contract requirements (R4, tabs 57, 72 at 5; tr. 1/141-43).

55. In response to the CO's direction to provide "a comprehensive Production Plan listing all tooling and equipment," DODS provided exhibit C to its cure notice response (R4, tabs 52, 54 at 2, 21; tr. 1/123). The "Production Plan" provided by DODS was a one-page document dated 30 June 2011, began with a date of 4 July 2011 and showed a first article shipment date of 24 October 2011, two months after the contract delivery date of 31 August 2011. The Production Plan was unsigned, and lacked a detailed description of actual production dates and processes. (R4, tab 54 at 21; tr. 1/116, 124, 3/108, 117, 4/120-38, 5/172) In fact, other than "Paint Part" listed as planned for the weeks of 5 and 12 September 2011, no other production processes appeared on DODS' production plan (R4, tab 54 at 21; tr. 4/132-33). No tooling or equipment were listed on the Production Plan (R4, tab 54 at 21), but DODS did include a separate generic equipment list in exhibit C (R4, tab 54 at 22-25). The equipment list identified three pieces of equipment owned by DODS and sixteen owned by TTF; all of the bonding and heat treating equipment belonged to TTF (R4, tab 54 at 22-25; tr. 1/125-26, 571-75).

56. In response to the CO's direction to provide "a detailed Manufacturing Plan," DODS provided exhibit B to its cure notice response (R4, tabs 52, 54 at 2, 16; tr. 1/117-18). The first sentence of the Manufacturing Plan referenced using Mylars, a medium the TMO had not used in more than a decade, rather than the CAD data provided by the government on the TDP CD (R4, tab 54 at 16; tr. 1/119). It was impossible to build the center wing section without using the CAD data provided on the TDP CD (R4, tab 58 at 8; tr. 1/119, 3/88, 198), DODS' cure notice response made no mention of using the CAD data provided by the government (R4, tab 54 at 16; tr. 1/30-31, 3/195-96).

19

57. Regarding the RFQs, none were provided for the subcontracting work to TTF or Dynamic Paint Solutions as indicated in its cure notice response letter and Manufacturing Plan (R4, tab 54 at 2, 17-18, 27-43). On at least two RFQs, DODS sought quotes simply by referencing Army drawing numbers out of the TDP from which the vendors would have had no way of providing a quote. In each instance, the vendor responded by indicating that it could not provide a quote. (R4, tab 54 at 28, 31; tr. 3/96-97) Several necessary parts and bulk material were not reflected anywhere in the RFQs or the POs, including nut assemblies, primer, label stock, adhesive, trailing edge, other small hardware items, and, notably, the channels (R4, tab 54 at 27-43, tab 3 at 107-11; tr. 3/92-96, 208-09). The channels are the extruded parts, bonded into the center wing section assembly for interface with the outboard wing assemblies and the left and right leading edges (R4, tab 3 at 104; tr. 2/212-13, 3/208-09). The channels are not off-the-shelf items readily available to DODS (tr. 3/208-09). DODS confirmed its ability to provide these channels prior to contract award, but did not explain how it would obtain the channels in its cure notice response (R4, tabs 7, 54).

58. Although appellant submitted documents purporting to be POs with its cure notice response, uncontradicted testimony established that appellant did not issue several of the POs (tr. 4/115). The one PO that could be verified as having been placed, was the PO for honeycomb material with a ten-week lead time. The honeycomb material is the roughly two-inch thick core of the wing structure that will have aluminum skins bonded on its top and bottom to create the wing (tr. 3/86). Although nothing prevented DODS from ordering the honeycomb material earlier (tr. 5/35), DODS allegedly waited until 13 July 2011 to place the PO with Plascore despite the fact that it had a ten-week lead time for delivery (R4, tab 54 at 3, 38-39). Compounding the issue, DODS did not actually place the Plascore PO for the honeycomb material on 13 July 2011 as the PO indicates; DODS placed that PO three weeks later, on or about 3 August 2011 (tr. 4/116).

59. Bonding was a critical process requirement for production of the center wing section (R4, tab 41; tr. 1/94, 3/112, 5/83). In August 2010, the DCMA QAR and a DCMA engineer had conducted an in-depth process review of the TTF bonding process, which resulted in a determination that TTF methods and facilities were incapable of complying with the imposed contract requirements at that time. Further, "[the] Clean Room and Autoclaves (which were 'not operational' at the time) must be repaired, returned to full functionality and certified before being placed back into production. Additionally, his bonding procedures must undergo process validation (his internal validation) before being used in production." (R4, tabs 31, 57, 72; tr. 1/142, 5/118-21) TTF remained incapable of performing bonding through the performance of the contract (tr. 5/121, 181).

60. The TMO engineers identified the clean room as critical to the manufacture of the center wing section in the 27 June 2011 meeting with the CO (R4, tab 41; tr. 1/84, 94). DODS' clean room was not ready for production (R4, tab 43; tr. 1/94-95). Therefore, the CO identified DODS' failure to provide a clean room specifically in her cure notice (R4, tab 52). DODS did not address the clean room issue in its cure notice

20

response, but it did state its plan to outsource bonding to TTF and thus made relevant any issues involving TTF's clean room (R4, tab 54 at 2; tr. 1/141). The clean room is used for adhesive application, and it is vitally important that no contaminants are present to compromise the adhesive seal (tr. 3/112-13, 5/120-21). The TTF "clean room" was not clean – it had a popcorn ceiling that generated thick dust, peeling paint and mildew on the walls, three doors that open directly into other areas including one directly into a sanding area. Neither DODS nor TTF had an acceptable clean room (tr. 5/181).

61. TTF was likewise incapable of properly conducting the required heat treating process (R4, tabs 31-34, 43; tr. 1/94-95, 5/197-98, 200-01, 203-06). On 7 July 2011, TTF failed to properly test its heat treatment process and conducted its heat treatment in violation of the AMS 2770 specification (R4, tabs 43, 70 at 2; tr. 5/197-206). Neither DODS nor TTF had a conforming heat treatment process (tr. 5/181).

The Termination

62. On 27 July 2011, the CO issued a final decision terminating the contract for default. After considering DODS' performance, DODS' cure notice response, input from government technical experts, and the factors in the FAR, the CO determined that DODS had "failed to make satisfactory progress and has failed to provide adequate assurance that DODS would be able to deliver the First Article item that would successfully pass performance testing by 31 August 2011, and that said failures did not arise out of causes beyond DODS' control." (R4, tab 58 at 9; tr. 1/144-46)

63. On 3 August 2011, the DCMA QAR handed Mr. Storey a copy of the modification terminating the contract (R4, tab 62). On 17 August 2011, DODS appealed the termination.

64. On 14 July 2011, the government posted a synopsis on FedBizOps for a requirement for additional spare center wing structure assemblies. This synopsis was not a replacement procurement action for the items covered by appellant's contract, but was rather to fill a need for an additional quantity of the same items. After the termination of the instant contract, the CO added nine additional items when the solicitation was posted on 3 August 2011. The contract was competed on a full and open competition basis, and the solicitation did not close until September 2011. The resulting contract price was unknown to anyone prior to the termination of appellant's contract for default. (R4, tab 76; app. supp. R4, tab 68; tr. 2/140-45)

65. By letter dated 9 April 2012, appellant submitted a certified "Delay Claim" in the amount of $2,057,477.40 to the CO. The CO denied the claim in its entirety in her final decision dated 13 June 2012. DODS' appeal of the final decision by letter of 31 August 2012 was docketed as ASBCA No. 58252. DODS failed to brief the issues associated with the affirmative claims except as they pertain to the excusability of the

21

default. No evidence was admitted at trial concerning the affirmative claims except as they concern appellant's defenses to that termination.

## DECISION

These appeals involve the propriety of the government's termination of the contract for default (ASBCA No. 57746) and appellant's allegations[2] that it was excusably delayed in the performance of the contract as a defense regarding the termination as well as a separate affirmative claim for monetary compensation (ASBCA No. 58252).

Termination for default is a "drastic sanction" that may be imposed only when there are "good grounds and on solid evidence." *Matrix Research, Inc.*, ASBCA Nos. 56430, 56431, 11-2 BCA ¶ 34,789 at 171,239 (citing *ABS Baumaschinenvertrieb GmbH*, ASBCA No. 48207, 00-2 BCA ¶ 31,090). The government bears the initial burden of showing that the termination was reasonable and justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). To support a termination for default for a contractor's failure to make progress so as to endanger performance of the contract, the CO must have a reasonable belief that there is no reasonable likelihood that the contractor can perform the entire contract effort within the time remaining for contract performance. *Lisbon Contractors*, 828 F.2d at 765. After the government makes that showing, the burden then shifts to the contractor to provide evidence of excuse for its default. *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996); *Matrix Research*, 11-2 BCA ¶ 34,789 at 171,239 (citing *Centurion Electronics Service*, ASBCA No. 48750, 00-1 BCA ¶ 30,642).

We find that the contract was properly terminated for default, that appellant failed to provide adequate assurances that it could timely perform in its response to the cure notice of 12 July 2011 and that DODS was not excusably delayed in the performance of the contract.

---

[2] It must be emphasized at the outset that appellant's briefs are replete with allegations that are not supported by trial testimony and other evidence in the record. Appellant elected not to appear for the final two days of the five-day hearing and submitted its case for decision on the existing record, including the transcript of the initial three days of the hearing. Appellant expressly recognized and acknowledged that the remainder of the hearing would proceed in appellant's absence. Consequently, appellant did not present a case-in-chief. In particular, Mr. Storey, appellant's principal did not appear to offer testimony under oath and subject himself to cross-examination. The briefs in substantial part consist of Mr. Storey's unsworn views that the government had no opportunity to rebut at trial. To the limited extent that appellant does cite to the record, the citations are often inaccurate and/or do not persuasively corroborate the allegations made.

A. Propriety of the Termination for Default for Failure to Make Progress

   1. No Reasonable Likelihood of Timely Performance

The CO's assessment of appellant's poor progress was justified and supported the reasonableness of her conclusion that there was no reasonable possibility that appellant could have timely performed the contract. Appellant was awarded the contract on 26 January 2011. The first article delivery date was 31 August 2011, 217 days after award. The contract included the First Article Approval–Government Testing clause, providing that contractor failure to deliver the first article on time would be treated as a failure to deliver under the Default clause. At the time of issuance of the cure notice, 75% of the performance period had expired. As of the date of the termination, 182 (84%) of the 217 days allotted for delivery had elapsed. There was no reasonable likelihood that appellant could have timely performed.

DODS implicitly conceded as much. Its "Production Plan," submitted to the CO in response to the cure notice, called for shipment of the first article on 24 October 2011. *Cf. Smart Power Systems, Inc.*, ASBCA No. 56743, 11-1 BCA ¶ 34,615 (granting summary judgment in favor of government where appellant admitted that it needed an additional 12 weeks to complete the first article requirement). Not only did DODS admit that it could not deliver by the contract date, there is no persuasive evidence that it was capable of performing by the date proposed in its cure notice response regardless of the excusability of the alleged delays discussed below. Particularly problematic for appellant was the failure to timely purchase materials. Ordering of the critical "honeycomb" material was not impacted by any delay associated with appellant's requests for assistance and should have been procured promptly. In fact, the purchase order for the "honeycomb" material was issued at an indeterminate time on the same day as the CO issued her final decision terminating the contract for default. Appellant's unsupported assertions in its briefs notwithstanding, the only evidence in the record indicates that the material required a ten-week lead time for delivery to DODS. Consequently, appellant would not have received the material until 12 October 2011. Production time, assuming the honeycomb materials and all other all requisite materials were on hand, would have required approximately an additional three months. Thus, the dates in the production plan were obviously not feasible. Not only did the plan provide for delivery of the first article approximately nine weeks after the contractually-specified date of 31 August 2011, delivery would not have occurred until about mid-January 2012. Even if the CO had extended the delivery date as requested by appellant, DODS could not have delivered by its proposed extended date. *Cf. ABC Knitwear Corp.*, ASBCA No. 22575, 81-1 BCA ¶ 14,826 at 73,169 (default termination proper prior to first article delivery date where contractor failed to order necessary yarn).

23

## 2. Lack of Purchasing Activity and Materials

The record contains a few RFQs purportedly issued by appellant to gather quotes for certain materials. However, there is no evidence RFQs were prepared by DODS for other necessary parts and materials, including the channels which the evidence indicates likely would not be readily available to DODS. Although DODS confirmed its ability prior to award to provide the channels, there is no persuasive explanation of how it would obtain the channels in its cure notice response. With minor exceptions, the materials generally could have been ordered before responses to the technical clarifications were provided. At least two of the RFQs contained insufficient information for potential vendors to base a quote.

No "Purchase Orders" were purported by DODS to have been placed prior to 15 July 2011. With the exception of the "honeycomb" material discussed above, however, there is no proof that DODS actually placed these "Purchase Orders" even though they were supplied to the CO in response to the cure notice. In addition, contracts with subcontractors, most importantly TTF, were not provided. We conclude that the lack of necessary materials was a significant factor justifying the termination. *Cf. Universal Fiberglass Corp. v. United States*, 537 F.2d 393, 398 (Ct. Cl. 1976); *Smart Power Systems*, 11-1 BCA ¶ 34,615.

## 3. Lack of Acceptable Facilities

The termination is also supported by appellant's deficient manufacturing facility and that of its proposed subcontractor TTF, a firm also owned by Mr. Storey that was located at the same address and with whom DODS shared facilities. In particular, bonding and heat treatment were critical requirements for production of the center wing section. TTF, which was to fulfill bonding and heat treating requirements, was incapable of properly performing the requisite operations during the performance period of the contract. In addition, we have found that the proposed clean room was deficient and equipment required significant repairs and certification before being returned to full functionality and placed back in operation. DODS in its brief challenges these conclusions, minimizes their significance and attributes them to DCMA malice and maladministration. However, appellant fails to cite to record evidence that impugns the government's evidence and our findings based thereon.

## B. Failure to Give Adequate Assurances in Response to Cure Notice

In accordance with the contract's Default clause, DODS was required to give adequate assurances of timely performance in response to the CO's cure notice. *E.g., Danzig v. AEC Corp.*, 224 F.3d 1333, 1338 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 995 (2001); *National Union Fire Insurance Co.*, ASBCA No. 34744, 90-1 BCA ¶ 22,266 at 111,855. Here, the termination was further justified by appellant's failure to give sufficient assurances of its capability of timely performing in a specification-compliant

24

manner. Its response in general was vague and largely unsubstantiated by persuasive evidence that it was taking adequate steps to perform. First, as detailed above, DODS had not yet ordered requisite materials even as late as the date of termination.

Moreover, both appellant's production and quality assurance plans, submitted to the CO in response to the cure notice, were deficient. *Cf. L&M Thomas Concrete Co.*, ASBCA No. 49198, 03-1 BCA ¶ 32,194. The perfunctory, unsigned, one-page "Production Plan," dated approximately two weeks prior to issuance of the cure notice, was particularly flawed and unacceptable. Among other things, it began with a date of 4 July 2011 (more than six months after award) and proposed a first article delivery date of 24 October 2011. The principal assumption underlying the plan was that appellant was entitled to time extensions of approximately two months. As explained herein, appellant was not entitled to any time extension.

The production plan also failed to identify basic production milestones and inspection points for critical manufacturing assembly operations. In this regard, it lacked fundamental understanding of the interrelation of the production and government quality assurance process. A primary purpose of the plan was to approximate dates during performance, sometimes referred to as government mandatory inspection points (GMIPs), to permit DCMA to plan its involvement and any site visits to fulfill its quality assurance role. Without advance notice and scheduling of GMIPs, this primary purpose of the plan was defeated.

We also consider that appellant's cure notice responses to the CO regarding its facilities, equipment and quality considerations generally did not meaningfully nor satisfactorily address known and documented deficiencies with its equipment and facilities discussed above. The equipment list generically identified three pieces of equipment owned by DODS and 16 pieces owned by TTF. All of the bonding and heat treating equipment was owned by TTF. Without subcontracting, DODS did not have the requisite equipment to complete the contract. To the extent that DODS intended to subcontract out the heat treating operations to a firm other than TTF as it alleges in its brief, it also failed to so inform the CO.

C. Excusable Delay Allegations

Appellant contends that it was excusably delayed and entitled to time extensions as a consequence of government-caused delays associated with the DCMA conduct of a post-award conference and late government responses to its technical inquiries. In addition, appellant generally cites government maladministration and actions tantamount to bad faith in support of its arguments that it was excusably delayed. These alleged delays attributable to the government also underlie appellant's claims for monetary adjustments comprising the subject matter of ASBCA No. 58252.

## 1. Post-Award Conference

The timing of the post-award conference with DCMA also did not delay appellant. In short, the record in this case does not justify appellant's allegations that DCMA prevented appellant from proceeding prior to the conduct of the conference.

First, the conference is for DCMA's benefit not the contractors. Although the conference is called for in DCMA internal regulations, it is not a contract requirement and there are no specific timing requirements for its conduct. As discussed below, appellant's cursory written production plan is dated well after the conference. Since an obvious purpose of the conference is to facilitate coordination with DCMA, productive discussion and scheduling of DCMA involvement could not occur without appellant approximating critical production/inspection milestones in its manufacturing/assembly operations. A plan, establishing critical manufacturing points to facilitate coordination with DCMA inspection needs, was one of the primary requisites for a meaningful meeting. Appellant has not established that it was ready for a productive meeting. In any event, conducting the conference was not a prerequisite to performance. As a minimum, the contractor could proceed with the ordering of materials and accomplish other preliminary tasks prior to the start of actual assembly/manufacturing. There is no evidence here that appellant placed any purchase orders until the approximate time of termination, if at all.

In addition, the post-award conference was rescheduled to accommodate appellant's schedule. Even the actual meeting date in early April was not unreasonably late. This is particularly true here given appellant's state of preparedness and since DODS expressly stated at the conference it would timely complete the first article with no mention of delay. Appellant first notified the government that it had been delayed three months *after* the conference.

## 2. Responses to Technical Inquiries

DODS alleges that the information contained in the TPD was "defective, outdated, obsolete and incorrect." Consequently, appellant alleges that it was necessary to ask three series of technical questions to clarify and resolve perceived deficiencies. The initial questions were posed to the government in October 2010 after receipt of the RFQ and prior to submission of its quotation. Approximately 3½ to five months following award, appellant sent further inquiries on 16 May and 21 June 2011. The first article was due on 31 August 2011. Appellant claims it was excusably delayed the entire period from the dates of its 16 May and 21 June 2011 inquiries until it was furnished with government responses.

We need not dwell at length on the various subjective factors to be considered in assessing the reasonableness of the time taken by the government to reply to the inquiries and/or dissect precisely when appellant and/or Mr. Storey were furnished the government

26

responses. To establish excusable delay, DODS not only must prove that the government's response time was unreasonable, but must also establish that it was actually delayed for a specific period while awaiting the government's response.[3] *See, e.g., Rivera Construction Co.*, ASBCA Nos. 29391, 30207, 88-2 BCA ¶ 20,750; *Elter S.A.*, ASBCA No. 52832 *et al.*, 02-1 BCA ¶ 31,672; *Sonora Manufacturing, Inc.*, ASBCA No. 31587 *et al.*, 91-1 BCA ¶ 23,444. Here, regardless of whether the government's response time was reasonable, the evidence wholly fails to establish that appellant was actually delayed pending receipt of the government's responses.

First, neither appellant's 16 May nor 21 June 2011 letters advised that its production could not proceed without the answers. Contemporaneously, no urgency was expressed by appellant. It was not until 6 July 2011, that appellant provided notice that the government's delay in responding to the "hidden line" question was allegedly impacting production. After learning that its 22 June response to that question had been emailed to the incorrect address, the government provided the response to appellant, Mr. Storey, on 11 July 2011.

In addition, the record affirmatively demonstrates that production was not impacted. There was no need to await a response before basic ordering of essential materials and extensive manufacturing and assembly commenced. The testimony of government technical personnel is the only detailed evidence in the record regarding the impact of the questions/replies, or lack thereof, on appellant's ability to make progress. Not only is that testimony unrefuted, we have no reason to doubt its credibility. In short, the government persuasively demonstrated that extensive ordering, manufacturing and assembly operations could have been accomplished pending receipt of the answers and that they were unaffected by those answers. Unaffected critical activities in significant part did not occur. Unsupported and conclusory assertions in appellant's briefs are insufficient to overcome this record evidence.

Appellant's inquiries primarily involved requests to use alternate, "equal" binders/adhesives and products that allegedly were new and/or improved versions of superseded versions of older adhesives. The TDP listing of these products generally also provided listings of multiple alternatives that appellant also could have used without inquiry. There is no suggestion that the alternatives already listed were also obsolete. The government emphasizes that appellant provided no manufacturer literature or technical descriptive data establishing their equivalence which affected the time that the government required to research and approve use of the substitutes. Again, we need not dig deep into the details to conclude that appellant was not excusably delayed by lack of a government answer. The overarching problem for appellant was that it has not demonstrated that it was ever approaching a stage in the production process where it would actually use the products in question. Regardless of whether the government's

---

[3] We need not address the government's contentions regarding whether appellant gave sufficient notice of the alleged delaying events.

response time was unreasonable, any delay had no impact on performance. Most obviously, even if the government had responded to the appellant's belated 21 June 2011 inquiries on the same date, the "honeycomb" material could not have been ordered and delivered to appellant until the end of August 2011, a few days before the first article was due. With all necessary materials on hand, actual production required approximately an additional 11 weeks assuming performance proceeded without further delays.

### 3. Government Maladministration and Allegations Tantamount to Bad Faith Generally

Persuasive proof is most lacking in appellant's allegations of government "confusion" and maladministration generally of the contract. The record fails to support allegations of lack of good faith by the government. Perhaps most significantly, even if vague allegations bore some seeds of truth, there is simply no convincing evidence that government actions actually delayed appellant's performance. Moreover on this record, if there was any "confusion," it was not attributable to the government but to appellant's lack of understanding of its own obligations under the contract.

The "confusion" and maladministration arguments are largely based on appellant's misinterpretation and misanalysis of our decision in another appeal, *DODS, Inc.*, ASBCA No. 57667, 12-2 BCA ¶ 35,078, *recon. denied*, 13 BCA ¶ 35,203 (hereinafter ASBCA No. 57667). Our decision in ASBCA No. 57667 is inapposite. That case involved a different government party and a different, unrelated contract and end item. The primary issue in ASBCA No. 57667 involved a fact-specific waiver of the termination date, not a failure to make progress as in the present case. No trial was conducted in ASBCA No. 57667 and the case was submitted by the parties for decision on the record pursuant to Board Rule 11. That record, the factual circumstances and bases for the decision are not in evidence in this appeal. The Army has rebutted in particular appellant's allegations of DCMA misconduct and maladministration. The primary DCMA individuals in question and involved in administering the contract testified under oath, explained the communications at issue and were subject to cross-examination in the instant appeal, unlike Mr. Storey. We also note that the alleged problems with DCMA surfaced in the spring of 2010, long before DODS submitted its quote and was awarded the contract in late January 2011. Consequently, the schedule proposed by appellant in mid-January 2011 and adopted by the government presumably took into consideration perceived difficulties and instructions allegedly issued by DCMA.

Appellant's emphasis on the perceived accuracy of routinely-prepared and required "Delay Notices" also diverts the focus from the primary issue in this appeal, i.e., whether there was any reasonable possibility that appellant could have produced the instant contract's end items on time. The notices involve unique facts and assessments regarding performance under other contracts and other end items. To examine their accuracy and how assessments and conclusions were reached in the context of litigating performance problems under the present contract, is a highly questionable excursion into

28

the outer fringes of relevance. In short, the CO was fully justified in reaching her termination decision without the reports based on the totality of the information available to her.[4] There is no evidence that the notices had a disproportionate or unreasonable influence on the termination decision. Other more significant factors concerning the details of the performance of this specific contract made that decision reasonable. We also do not consider that appellant has proved that these reports were prepared maliciously or in bad faith.

Appellant alleges that subsequent procurement of the end items also calls into question the propriety of the termination suggesting that the CO "had already made up her mind." Apparently appellant is referencing the 14 July 2011 posting of a synopsis on the FedBizOps website and subsequent 3 August 2011 solicitation for the items. The later procurement had no proven bearing on the CO's decision. There is no evidence tending to indicate that the synopsis was anything more that a routine notice to potential offerors of the government's recurring future needs. Only after appellant's default were an additional nine end items added to the solicitation. The CO could not have known at the time of her decision that the items would be procured post-termination in September 2011 at a substantially reduced cost, a cost savings which effectively benefitted appellant inasmuch as no excess cost assessment was made by the government as a consequence of the reprocurement.

## D. ASBCA No. 58252

Appellant's briefs do not address its claims comprising the subject matter of ASBCA No. 58252 for compensable delay. We need not decide whether the claims were effectively abandoned as argued by the government. The claims lack merit and are unproven in any event. As we have detailed above, appellant has not shown that it was excusably delayed as a defense to the termination for default. For the same reasons, appellant has failed to establish that it is entitled to a monetary adjustment for the alleged causes of delay in dispute. Appellant has not proved that it is entitled to a time extension for any government-caused delay. Accordingly, it is unnecessary to discuss additional issues relating to whether DODS concurrently caused such delays or its failure to detail its methodology in computing the delay period and the amount claimed.

---

[4] It warrants emphasis that appellant inexplicably argues that the CO was negligent in not promptly taking termination action *sooner* given the purported seriousness of the delay information contained in the notices. Apparently DODS considers that her alleged failure to take prompt action constituted a waiver of the government's right to terminate. The "waiver" doctrine of course, *inter alia,* requires the actual passage of the delivery date which had not occurred here.

The appeals are denied.

Dated: 22 July 2014

ROBERT T. PEACOCK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

PETER D. TING
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57746, 58252, Appeals of DODS, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals